Joseph Donald TURE, Jr.,
petitioner, Appellant,

v.

STATE of Minnesota, Respondent.

No. A03–1457.

Supreme Court of Minnesota.

June 3, 2004.

Mark D. Nyvold, Joseph Special Ass't State Public Defender, St. Paul, Joseph Donald Ture, MCF-Stillwater, Bayport, Attorneys for Appellant.

Michael A. Hatch, State Attorney General, St. Paul, Doug Johnson, Washington County Attorney, John W. Fristik, Ass't County Attorney Government Center, Stillwater, Attorneys for Respondent.

## OPINION

ANDERSON, PAUL H., Justice.

In 1998, Joseph Donald Ture, Jr. was convicted of first-degree murder for the May 1979 death of Marlys Wohlenhaus. On appeal of the denial of postconviction relief, which is the first substantive review of his conviction, Ture alleges a number of trial errors that he claims entitle him to relief from conviction. Specifically, Ture alleges as error: (1) the admission of *Spreigl* evidence regarding the murder of Diane Edwards and the manner in which this evidence was presented at trial; (2)

the admission of numerous pages of women's names, addresses, phone numbers, and license plate numbers; (3) the district court's failure to use a more specific cautionary instruction to limit the use of *Spreigl* evidence; and (4) the state's conduct during closing argument. Ture also submitted a supplemental pro se brief requesting relief. We affirm.

At about 3:30 p.m. on May 8, 1979, 18-year-old Marlys Wohlenhaus was discovered by her mother in a downstairs room of their Afton home covered in blood with her head "bashed in." Wohlenhaus had several star-shaped cuts on her scalp and her skull was fractured. The injuries caused uncontrollable bleeding and severe brain injury. Wohlenhaus was hospitalized and underwent emergency surgery, but the next day she was taken off a respirator and pronounced dead. An autopsy also revealed broken fingers and bruises on both hands.

The Washington County Sheriff's Department investigated the murder and had several leads. The leads included a neighbor who saw a car fishtail out of Wohlenhaus's driveway at about 3:15 p.m. on May 8, the day Wohlenhaus was assaulted. Also, a friend of Wohlenhaus testified that on the night before Wohlenhaus's death, she and Wohlenhaus had been at a restaurant in Afton and Wohlenhaus had appeared upset upon seeing a man sitting in the back of the restaurant. The man had light blond hair and was wearing a leather coat, sunglasses, and a baseball cap. The man apparently followed the two women on a motorcycle after they left the restaurant. Despite the investigation of several suspects, no one was charged in connection with Wohlenhaus's death.

In the early 1990's, Everett Doolittle, a Special Agent with the Cold Case Unit of the Bureau of Criminal Apprehension (BCA), began investigating the Wohlenhaus murder. Appellant Joseph Donald Ture, Jr. was one of the suspects in the case because of evidence that he had made a detailed written confession to the Wohlenhaus murder while in jail awaiting trial for another crime. Nevertheless, Ture had been cleared as a suspect because he was thought to have been working at the Saint Paul Ford plant at the time of the murder.

Ture's written confession was drafted in November and December 1981 while he was being held in the Sherburne County Jail awaiting trial for the murder of Diane Edwards, a 19-year-old waitress who was abducted from West Saint Paul, sexually assaulted, and killed in 1980.[1] While in jail, Ture had fellow inmate Toby Krominga draft a confession to the Wohlenhaus murder and "another matter."[2] Ture signed the confession, stating that he was making the confession with the hope of getting to Saint Peter State Hospital for treatment. According to the confession, in 1978 Ture worked part time for Wohlenhaus's father at Greg's Body Shop in Afton. Ture claimed that Wohlenhaus's father wanted Ture to kill Wohlenhaus's mother and that Ture drove to the Wohlenhaus home to kill the mother. According to his statement, while Ture waited outside for Wohlenhaus's mother to arrive, Wohlenhaus came home and she invited

---

1. Ture was ultimately convicted for the murder of Diane Edwards. *See State v. Ture,* 353 N.W.2d 502 (Minn.1984) (affirming Ture's conviction for first-degree murder of Edwards).

2. The phrase "another matter" refers to the 1978 murder of Alice Huling and three of her four children. Ture was ultimately convicted of these murders as well. *See State v. Ture,* 632 N.W.2d 621 (Minn.2001) (affirming conviction for four counts of first-degree murder).

Ture inside to "smoke dope." Ture asked Wohlenhaus for sex, but she rejected his advances. Ture then got upset and hit her with a hatchet. A handwriting expert for the BCA testified at Ture's trial that the signatures on each page of the confession were Ture's.

Ture also confessed to David Hofstad, who worked in the Sherburne County Attorney's Office from 1981–1982. Hofstad received a call in November 1981 from a Twin Cities television news cameraman with whom he was acquainted. The cameraman apparently told Hofstad he should talk to Ture about Wohlenhaus. Ture, who was still in jail awaiting trial for the Edwards murder, agreed to meet with Hofstad. Hofstad, who knew nothing about the Wohlenhaus murder, asked Ture about Wohlenhaus and Ture told him that he had known her, she had been a waitress, and he had wanted to date her. Ture then told Hofstad that he had wanted to talk to Wohlenhaus, so one day he went to her house to wait for her to come home. He got into the house through the garage and, when Wohlenhaus arrived, they talked, argued, and he killed her with either a hatchet or a crowbar. Hofstad later called the Washington County Sheriff's Office and spoke with someone involved with the investigation of Wohlenhaus's murder about what Ture told him.

Upon further investigation of Ture, Doolittle discovered that authorities had cleared Ture as a suspect because they believed he was working at the Ford plant at the time of the murder. However, Doolittle concluded that this alibi was erroneous because the authorities had mistakenly looked up the work schedule of his father, Joseph Ture, Sr.

Ture was indicted in 1996 for first-degree premeditated murder in violation of Minn.Stat. § 609.185, subd. 1 (1978), in connection with Wohlenhaus's death. He was tried before a jury beginning in September 1998. In addition to both Krominga and Hofstad, other witnesses testified at trial that Ture directly and indirectly told them about the Wohlenhaus murder. Former Washington County Deputy Sheriff Jeff Klarich testified that Freeman Stanton, a former cellmate of Ture's in Montana, told him that Ture had said that he had "beat" a young girl to death with an axe or hatchet. Several former inmates of Ture's also testified. Donald Mampel testified that in 1981 or 1982 when a news story was on television about a girl who had been killed in Afton, Ture stated that the authorities would never be able to prove it against him. Randall Ferguson testified that in May 1998, at Oak Park Heights Prison, Ture bragged to him that he had beaten a woman to death in Afton. Ray Lumsden testified that in 1990 or 1991 Ture described killing a male victim while burglarizing a small house in a rural area of Afton. Leon Lasley testified that in the summer of 1998 he overheard Ture asking a prisoner with cancer to "take the rap" for him.

Wohlenhaus's friend who had been out with Wohlenhaus the night before she was assaulted also testified. The friend stated that Ture could have been the man in the restaurant whom Wohlenhaus was upset upon seeing and who followed them on a motorcycle. A man who worked at Greg's Body Shop in 1979 identified Ture from a photo array and testified that he could have been a man he had seen riding a motorcycle in the Afton area between 1978 and 1980. Another man, who lived near the Wohlenhaus residence in Afton, identified a photo of Ture as someone he had seen in the Afton area and testified that he remembered him having a motorcycle.

Over Ture's objection, the state offered testimony that in 1980 Ture abducted Diane Edwards as she was walking home

after working at the Robert Street Perkins restaurant in West Saint Paul and eventually murdered her. Ture was convicted of the Edwards murder. Twenty-four witnesses testified to the details of the Edwards murder, taking up almost three of the twelve total days of trial testimony. In sum, witnesses testified that Edwards' body was found in rural Sherburne County approximately two weeks after she went missing. Evidence indicated that Edwards had been sexually assaulted and died of stab wounds to her chest. Ture had confessed to the Edwards murder while he was in jail waiting to be tried for that murder and again after he was convicted. The state also attempted to offer evidence about the murder of Alice Huling and three of her four children, as well as another murder, but the court did not allow the state to present this evidence.

Jack Kulseth, a retired Minneapolis homicide investigator, testified that he interviewed Ture in late October 1980 while investigating the Edwards murder. Through Kulseth, the state offered a looseleaf notebook and various other notebooks and address books found during a 1980 search of Ture's motor vehicle and garage in South Saint Paul. The notebooks and address books contained listings of women's names, license plate numbers, addresses, and phone numbers. Included in these notebooks, which listed the names of women and their descriptions, was a reference to the West Saint Paul Perkins. The notebooks do not appear to contain any information related to Wohlenhaus.

Ture did not testify, but presented witnesses who lived in the Afton area in 1979. These witnesses, who included persons who worked at Greg's Body Shop, gave testimony directed at contradicting some of the details of Ture's written confession. This included testimony that they did not know a man named Joseph Ture, Jr. or that they did not recognize him in any of the police photo line-ups.

At the close of trial, the district court instructed the jury on the limited use of *Spreigl* evidence by stating:

The state introduced evidence in this case of an occurrence on September 26th, 1980 involving Diane Edwards. As I told you at the time that this evidence was offered, it was admitted for the limited purpose of assisting you in determining whether defendant committed the crimes with which he is charged in the indictment I read to you.

[The] defendant is not being tried for and may not be convicted of any crime other than the crime charged in the indictment. You are instructed specifically that you are not to convict [the] defendant on the basis of any occurrence on September 26th, 1980, involving Diane Edwards. To do so might result in unjust double punishment.

This instruction was adapted from Criminal Jury Instruction 3.16. *See* 10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal,* CRIMJIG 3.16 (4th ed.1999) (hereinafter "CRIMJIG 3.16"). Ture objected to this instruction, arguing that the court should use the Eighth Circuit's instruction for a defendant's prior similar acts because that instruction specifies that the jury could use *Spreigl* evidence for purposes of identity.

Ture was convicted of first-degree premeditated murder and sentenced to life in prison consecutive to other sentences he was serving. Following his conviction, Ture filed a direct appeal. However, after Ture's attorney unsuccessfully sought to supplement the record on the jury instructions requested by Ture at trial, Ture and the state stipulated to a dismissal of the appeal, which we accepted. Ture subsequently filed for postconviction relief. He did not request an evidentiary hearing, but

alleged a number of trial errors he claimed entitle him to relief from conviction. The alleged errors were: (1) the admission of *Spreigl* evidence regarding the murder of Diane Edwards and the manner in which this evidence was presented at trial; (2) the admission of pages of women's names, addresses, phone numbers, and license plate numbers; (3) the district court's failure to use a more specific cautionary instruction to limit the use of *Spreigl* evidence; and (4) the state's conduct during closing argument. The postconviction court denied the petition without conducting a hearing pursuant to Minn.Stat. § 590.04, subd. 1 (2002). On appeal of the denial of postconviction relief, Ture asserts the same errors argued to the postconviction court.

## I.

■ We begin by addressing whether the district court properly admitted *Spreigl* evidence that Ture murdered Edwards. *Spreigl* evidence is evidence of another crime, wrong, or bad act—the appellation is derived from our decision in *State v. Spreigl*, 272 Minn. 488, 139 N.W.2d 167 (1965). On appeal of the denial of postconviction relief that is an appellant's first substantive review of his conviction, we review whether there is sufficient evidence in the record to sustain the postconviction court's findings. *Butala v. State*, 664 N.W.2d 333, 338 (Minn.2003). A district court's decision to admit *Spreigl* evidence is reviewed for abuse of discretion. *See State v. Shannon*, 583 N.W.2d 579, 583 (Minn.1998).

Evidence of another crime, wrong, or act is not admissible at trial to prove the character of a person in order to show that he acted in conformity therewith. Minn. R. Evid. 404(b). Such evidence may be admissible for other purposes, however, such as "proof of motive, opportunity, in-

tent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* For the evidence to be admissible, "the other crime, wrong, or act and the participation in it by a relevant person [must be] proven by clear and convincing evidence." *Id.*

■ To admit *Spreigl* evidence, the district court must determine "(1) that the evidence is clear and convincing that the defendant participated in the other offense; (2) that the *Spreigl* evidence is relevant and material to the state's case; and (3) that the probative value of the *Spreigl* evidence is not outweighed by its potential for unfair prejudice." *Shannon*, 583 N.W.2d at 583. Ture was convicted of killing Edwards and he does not dispute that the evidence of his murder of her was clear and convincing. Ture does, however, argue that the court did not admit the Edwards murder evidence for a proper *Spreigl* purpose (i.e., that it was not relevant) and that the evidence, particularly because of the way it was presented at trial, was more prejudicial than probative.

■ The district court admitted the Edwards murder evidence for several purposes other than to identify Ture as the murderer of Wohlenhaus as well as Edwards, including to illustrate Ture's intent and modus operandi. To determine the relevance of such evidence, a district court should consider "the issues in the case, the reasons and need for the evidence, and whether there is a sufficiently close relationship between the charged offense and the *Spreigl* offense in time, place, or modus operandi." *State v. DeBaere*, 356 N.W.2d 301, 305 (Minn.1984). The closer the relationship between the events, the greater the relevance of the evidence and the lesser the likelihood it will be used for an improper purpose. *State v. Lynch*, 590 N.W.2d 75, 80 (Minn.1999). *Spreigl* evidence need not be identical in every way to

the charged crime, but should serve to "complete the picture" of the defendant and "not to paint another picture." *Lynch*, 590 N.W.2d at 81 (quoting *State v. Berry*, 484 N.W.2d 14, 18 (Minn.1992)).

■ The record establishes that the Edwards murder and the Wohlenhaus murder were similar in time, place, and modus operandi. Edwards was a 19 year old waitress when she was abducted and murdered; Wohlenhaus was an 18 year old waitress. Edwards was abducted from West Saint Paul, about 20 miles from Afton, approximately 16 months after Wohlenhaus was murdered in Afton. Ture, who maintained a garage in South Saint Paul, told law enforcement officials that he frequented the Perkins restaurant in West Saint Paul where Edwards worked and that he asked her out on dates. Ture told law enforcement officials that he "blew up" at Edwards after she said something he did not like. Evidence indicated that Edwards was sexually assaulted and stabbed multiple times. Krominga testified that Ture told him he wanted to have sex with Wohlenhaus and that when she refused he "freaked," grabbed a hatchet, and struck her in the head. Hofstad testified that Ture told him Wohlenhaus was a waitress and that he had wanted to date her. Ture also discussed the details of the Edwards and Wohlenhaus murders with authorities, a reporter, and fellow inmates in a similar fashion and in tandem. For all these reasons, we conclude that the district court did not abuse its discretion in ruling that the Edwards murder evidence was relevant.

■ Even when relevant, however, *Spreigl* evidence should be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice." Minn. R. Evid. 403. *Spreigl* evidence "should be excluded where it is merely cumulative and a subterfuge for impugning a defen-

dant's character or for indicating to the jury that he is a proper candidate for punishment." *State v. Billstrom*, 276 Minn. 174, 179, 149 N.W.2d 281, 284–85 (1967). Ture argues that the state's presentation of 24 witnesses testifying to the details of the Edwards murder for almost three of the twelve days of trial testimony made the evidence highly prejudicial. We agree with much of Ture's argument. The state's presentation of evidence was practically a retrial of the Edwards case. Much of the witnesses' testimony was redundant. While the state had the right to present evidence of the details of the Edwards murder, courts should not allow the state, when presenting *Spreigl* evidence, to present evidence that is unduly cumulative with the potential to fixate the jury on the defendant's guilt of the other crime. *See* Minn. R. Evid. 403.

Nevertheless, Ture did not object to the number of witnesses who testified regarding the details of the Edwards murder, nor did Ture object on the record to the testimony of specific witnesses who may have presented unduly prejudicial testimony. Without Ture's objection to the manner in which the Edwards murder evidence was presented, we are reluctant to second-guess the court's sound discretion. Therefore, we hold that the district court did not abuse its discretion by admitting the Edwards murder evidence.

## II.

■ Ture also argues that the district court erroneously admitted notebooks and address books seized from him during the 1980 investigation of the Edwards murder. These items contained women's names, license plate numbers, addresses, and phone numbers, including a reference to the West Saint Paul Perkins where Edwards worked. Ture argues that this evidence was *Spreigl* evidence improperly admitted

without notice because this behavior-collecting information on various women could be characterized as stalking. The district court and postconviction court both concluded that the evidence was not evidence of bad acts because there is nothing per se wrong with collecting information on women. We agree that this evidence was not *Spreigl* evidence.

■ Ture also argues, as he did at trial, that the notebooks and address books were not relevant because they did not appear to contain any information related to Wohlenhaus. The postconviction court found that the evidence was admitted because collecting information on women was Ture's habit and routine practice. Evidence of a habit or routine practice is relevant because it describes "one's regular response to a repeated specific situation." Minn. R. Evid. 406 advisory committee comment–1989 (quoting C.T. McCormick, Evidence § 195 (2d ed.1972)). "Whether the response is sufficiently regular and whether the specific situation has been repeated enough to constitute habit are questions for the trial court." *Id.* (citing Lewan, *Rationale of Habit Evidence*, 16 Syracuse L.Rev. 39 (1964)).

While the postconviction court found that the notebooks and address books were evidence of Ture's habit and routine practice, the record does not indicate that the district court made any kind of inquiry to assure that a true habit existed. *See id.* ("The [district court] should make a searching inquiry to assure that a true habit exists."). The state concedes that whether Ture's collection of information on women was proper evidence of his habit or routine practice is a close call. We agree. Regardless, following a thorough review of the record, we hold that even if admission of this evidence was erroneous, the error was harmless because the verdict was surely unattributable to the error. *See State v. Juarez*, 572 N.W.2d 286, 292 (Minn.1997).

## III.

■ Next, we consider the district court's refusal to grant Ture's request to use the Eighth Circuit's jury instruction for the admission of evidence of prior bad acts. The court instructed the jury using an adaptation of CRIMJIG 3.16 to the facts of this case. *See* CRIMJIG 3.16.[3] Ture argued that Eighth Circuit Model Instruction 2.09[4] would be a more appro-

3. The State has introduced evidence of an occurrence on _____ at _____. As I told you at the time this evidence was offered, it was admitted for the limited purpose of assisting you in determining whether the defendant committed those acts with which the defendant is charged in the (indictment) (complaint).

The defendant is not being tried for and may not be convicted of any offense other than the charged offense(s). You are not to convict the defendant on the basis of any occurrence on _____ at _____. To do so might result in unjust, double punishment. 10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal*, CRIMJIG 3.16 (4th ed.1999).

4. You [are about to hear] [have heard] evidence that the defendant previously committed [an act] [acts] similar to [the one] [those] charged in this case. You may use this evidence to help you decide manner in which the evidence will be used to prove identity— e.g.,[whether the similarity between the act[s] previously committed and the one[s] charged in this case suggests that the same person committed all of them.]

Remember, however, that the mere fact that the defendant may have committed [a similar act] [similar acts] in the past is not evidence that [he][she] committed such [an act] [acts] in this case. The defendant is on trial for the crime[s] charged and for [that] [those] crime[s] alone. You may not convict a person simply because you believe [he][she] may have committed some act[s], even bad act[s], in the past.
*Manual of Model Criminal Jury Instructions for the District Courts of the Eighth Circuit*

priate instruction because the only proper use for the *Spreigl* evidence was to determine the identity of the person who killed Wohlenhaus. According to Ture, failure to give this instruction prejudiced him because the instruction the court gave left the jury free to use the *Spreigl* evidence for purposes other than proof of identity.

We observed in *Billstrom* that, as a safeguard for the admission of *Spreigl* evidence, the court "should admonish the jury that the testimony is received for the limited purpose of establishing identity." 276 Minn. at 179, 149 N.W.2d at 285. In *State v. Broulik,* we considered the approach taken by several federal appellate jurisdictions, including the Eighth Circuit, which include in their model instructions the specific limited purpose for which evidence of prior bad acts may be used. 606 N.W.2d 64, 70–71 (Minn.2000). We contrasted this approach with CRIMJIG 3.16, which leaves the possible inferences that may be drawn from the evidence to the arguments of counsel. *Id.* We noted that we did not read *Billstrom* as mandating a specific limited purpose instruction for *Spreigl* evidence. *Broulik,* 606 N.W.2d at 69. However, in *Broulik* we did not reach any conclusions on the instruction issue, holding that a "trial court's failure to give an instruction on the specific purpose for which Rule 404(b) evidence may be considered is not error where no request to so instruct is made." *Id.* at 71.

Here, Ture specifically requested Eighth Circuit Model Instruction 2.09 rather than the CRIMJIG instruction for *Spreigl* evidence. Eighth Circuit Model Criminal Jury Instruction 2.09 is given when evidence of a defendant's prior similar acts is introduced to prove identity. *Eighth Circuit CRIM MI* 2.09. Eighth Circuit Model

Instruction 2.08 is given when evidence of a defendant's prior similar acts is introduced for a purpose other than to prove identity, which purpose is to be specifically described in the instruction. *Eighth Circuit CRIM MI* 2.08. The primary difference between Eighth Circuit Model Instruction 2.09 and CRIMJIG 3.16 is that the Eighth Circuit instruction specifically limits the jury's use of the evidence to whether it "suggests that the same person" committed the act, whereas CRIMJIG 3.16 more generally limits the jury's use of the evidence to "determining whether defendant committed those acts with which the defendant is charged."

We have stated that as a general rule, "instructions on particular kinds of evidence 'should be avoided as much as possible' " because they tend to inject argument into the judge's charge. *State v. Olson,* 482 N.W.2d 212, 215 (Minn.1992) (quoting *Manual of Model Criminal Jury Instructions for the Ninth Circuit* 48 (1989 ed.)). CRIMJIG 3.16 leaves it to the attorneys to argue to the jury the possible inferences that can be drawn from the evidence. We have utilized this approach because *Spreigl* evidence does not always fit neatly into specific categories-purposes such as identity, "common scheme or plan," and modus operandi may overlap, or the evidence may be properly admitted for more than one purpose. *See State v. Forsman,* 260 N.W.2d 160, 167 (Minn.1977) (discussing how the "common scheme or plan" exception has evolved to embrace offenses which tend to corroborate the charged offense because of their marked similarity in modus operandi).

Based on the foregoing distinction, we conclude that under the circumstances

Instruction 2.09 (2002 ed.) (hereinafter "Eighth Circuit CRIM–MI") (brackets in original).

here, when the Edwards murder evidence was not necessarily admitted solely for purposes of proving identity, Eighth Circuit Model Instruction 2.09 would not have been a better instruction than the adapted CRIMJIG 3.16 instruction. Accordingly, we hold that the district court did not abuse its discretion in giving the CRIMJIG instruction instead of Ture's requested instruction.

## IV.

■ Ture next argues that during closing argument the state committed prosecutorial misconduct sufficient to warrant a new trial. Ture argues that the state improperly mentioned other rapes that Ture committed, evidence of which was not permitted at trial. He asserts the state did so by arguing to the jurors that Ture had confessed to the Edwards case "to try and get a package deal for the Diane Edwards murder and other cases, *other rapes.*" (Emphasis added.) Ture also argues that the state committed misconduct by arguing Ture's character to the jurors when he told them the state had Diane Edwards' father testify because the state wanted the jury to "see what kind of a man Joe Ture is, and how he acts and how he behaves consistently in his crimes." Finally, Ture argues that the state improperly personalized the case against Ture and interjected personal opinion into the closing argument through use of phrases such as "I wanted you to see" and by twice addressing a portion of the closing argument to Ture rather than to the jury. Following the state's closing argument, Ture moved for a mistrial based on these comments, which the district court denied.

■ Prosecutorial misconduct does not in and of itself necessitate that a defendant be granted a new trial. *State v. Atkins,* 543 N.W.2d 642, 647 (Minn.1996). Once misconduct has been established, we must then determine whether the defendant was denied a fair trial. *Id.* at 647–48. Generally, a defendant alleging prosecutorial misconduct will not be granted a new trial if the misconduct was harmless beyond a reasonable doubt. *State v. Hunt,* 615 N.W.2d 294, 301–02 (Minn.2000). To determine whether the state committed misconduct warranting a new trial, we look to the closing argument as a whole, rather than to selected phrases and remarks. *State v. Walsh,* 495 N.W.2d 602, 607 (Minn. 1993).

The postconviction court noted, as did the district court in denying the mistrial motion, that the closing argument was two and a half hours long, summarized a complicated murder trial, and the misconduct appeared to have been inadvertent. The postconviction court concluded that the state's comments did not deny Ture the right to a fair trial. We agree and conclude that while the state committed misconduct during closing argument, the misconduct was harmless beyond a reasonable doubt.

The state's mention of "other rapes" was clearly improper given that evidence of Ture's prior sexual assaults was ruled inadmissible at trial. However, the jury was presented evidence of Ture's rape and murder of Edwards, and the jury had been made aware of "other cases." We do not believe that this single reference to another rape, given all that the jury already knew about Ture, entitles Ture to a new trial.

■ The state's argument regarding Ture's character was also inappropriate. Character attacks are improper during closing argument. *State v. Washington,* 521 N.W.2d 35, 39 (Minn.1994). In this case in particular, the state's argument regarding "what kind of man Joe Ture is" appears to strike at the heart of the potential for prejudice inherent with *Spreigl*

evidence. But this statement must be read in context. It appears that the state was attempting to illustrate the similarities of the Edwards and Wohlenhaus murders and to tie the evidence together. This type of reference to character came just one time during the closing argument and the state specifically mentioned how Ture behaves "consistently in his crimes," not that the Edwards murder showed his character for such crimes.

■■■ Finally, we conclude that the use of the first-person pronoun "I" during closing argument and addressing of portions of the argument directly to Ture was an improper interjection of personal opinion into the argument. An attorney may argue a particular witness's credibility, but may not interject his or her personal opinion so as to "personally attach[] himself or herself to the cause which he or she represents." *State v. Everett*, 472 N.W.2d 864, 870 (Minn.1991). This "personal opinion rule" helps prevent "exploitation of the influence of the prosecutor's office." *Id.* (citing ABA Standards Relating to the Prosecutor's Function, 3–5.8(b) and Commentary (1979)). Nevertheless, we conclude that the state's actions could not reasonably have had an impact on the jury's verdict. Therefore, while we are troubled by the state's conduct during closing argument, after examining the argument as a whole, we hold that the state's misconduct was harmless beyond a reasonable doubt and does not warrant a new trial.

## V.

In addition to arguments presented through counsel, Ture submitted a supplemental pro se brief arguing, among other things, that he was denied effective assistance of counsel and that the evidence was insufficient for this conviction. Ture argues he was denied effective assistance because, he claims, his counsel allowed the state to present inaccurate testimony about when his work hours were at the Saint Paul Ford plant in 1979. Ture claims he was working at the time the Wohlenhaus murder took place. We have considered each of Ture's pro se arguments and, after a thorough review of the record and case law relevant to these arguments, we hold that none of these arguments has merit.

Affirmed.